MLM:EJM             M07-0521   ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

MOHAMMED ZUBAIR HOSSAIN,
TOGOR LNU, also known as
     "Niaz Makdum,"
     "Nazir Kahn,"
     "Razu Ahmed Kahn,"
     "Aman Ali,"
     "Liaquat Munshi," and
     "Liaquat Ali,'
MOHITUL ISLAM,
LALON AHMED, also known as
     "Abdul Barek" and
     "Aabdul Rouf,"
MOHAMMED JEWEL, also known as
     "Wahid Chowdhury,"
MEHDI HASAN, also known as
     "MD Karim,"
IQBAL HASAN, also known as
     "Mohammed Sajjad Hossain,"
HUMAYUN KABIR,
GOLAM BAHUDDIN SADI, and
MIZANUR RAHMAN,

         Defendants.

- - - - - - - - - - - - - - - - - - X

AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(T. 18, U.S.C. §§
1344 and 1349)

EASTERN DISTRICT OF NEW YORK, SS:

       JOSEPH MORIARTY, being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation (FBI), duly appointed according to law and acting

as such.

In or about and between January 2005 and the filing of this complaint, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MOHAMMED ZUBAIR HOSSAIN; TOGOR LNU, also known as "Niaz Makdum", "Nazir Kahn", "Razu Ahmed Kahn", "Aman Ali", "Liaquat Munshi", and "Liaquat Ali"; "MOHITUL ISLAM"; LALON AHMED, also known as "Abdul Barek" and "Abdul Rouf"; MOHAMMED JEWEL, also known as "Wahid Chowdhury"; MEHDI HASAN, also known as "MD Karim"; IQBAL HASAN, also known as "Mohammed Sajjad Hossain"; HUMAYUN KABIR; GOLAM BAHUDDIN SADI and MIZANUR RAHMAN, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud financial institutions, to wit: American Home Mortgage, Argent Mortgage, Long Beach Mortgage Company, Fremont Investment and Loan, Aurora Loan Services, BNC Mortgage, Lehman Brothers Bank, Webster Bank, HSBC Bank, New Century Mortgage, WMC Mortgage Corporation, GFI Mortgage Bankers Incorporated, Alliance Mortgage Banking Corporation and Equifirst Corporation, and to obtain moneys owned by them and under their custody and control by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349)

The source of my information and grounds for my beliefs

are as follows:

1.    I have been a Special Agent with the FBI for approximately five years and I am currently assigned to a financial institutions fraud squad, which investigates violations of federal criminal laws affecting financial institutions and other financial crimes.  In this position, I have conducted physical surveillance, interviewed witnesses, reviewed extensive documents obtained through the service of subpoenas, and used other investigative techniques to secure relevant information for use in criminal prosecutions.

2.    My knowledge of the information set forth in this affidavit is based upon my personal participation in this investigation and in numerous other investigations of fraud perpetrated against financial institutions, including bank fraud, my review of records and reports, my review of recorded conversations between cooperating witnesses and the subjects of the investigation, my discussions with witnesses and victims, my conversations with other law enforcement agents involved in this investigation and similar investigations, my conversations with and review of information provided by financial institutions and my law enforcement experience and training.

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of arrest warrants, it does not include all of the facts

I have learned during the course of this investigation. Where actions, conversations and statements of others are reported in this affidavit, they are reported in substance and in part unless otherwise indicated.

<u>BACKGROUND OF THE INVESTIGATION</u>

I. <u>THE MORTGAGE LOAN APPLICATION PROCESS</u>

<u>New Generation Funding</u>

4. At all times relevant to this complaint, New Generation Funding ("NGF"), located at 108-18 Queens Boulevard, Forest Hills, New York, held itself out as a mortgage broker. In September 2005, NGF opened a Jackson Heights branch that would be run by individuals of Bangladeshi heritage and cater primarily to that community. The principals of NGF included defendants TOGOR, MOHITUL and ZUBAIR, along with CW1,[1] the primary source of my information as to the leadership and the framework of the conspiracy described below. ZUBAIR became the branch manager for the Jackson Heights branch of NGF. TOGOR LNU (hereinafter "TOGOR"), MOHITUL ISLAM (hereinafter "MOHITUL") and MOHAMMED ZUBAIR HOSSAIN (hereinafter "ZUBAIR") worked together to process and secure loans for buyers. According to CW1, straw buyers were recruited by the principals to purchase properties using false

---

[1] CW1 was a partner in the mortgage fraud and has agreed to plead guilty and to cooperate with law enforcement to receive a lesser sentence. His/her information has proven to be reliable.

identities.  According to CW1, NGF's principals helped the straw buyers secure mortgages from financial institutions using false identity and other credit-related information.  The straw buyers included LALON AHMED, MOHAMMED JEWEL, MEHDI HASAN, IQBAL HASAN, HUMAYUN KABIR, GOLAM BAHUDDIN SADI and MIZANUR RAHMAN.  My investigation revealed that NGF began receiving a substantial increase in applications from the Bangladeshi community in 2004 and 2005.  This business was brought in by TOGOR, ZUBAIR, CW1 and others and handled administratively at NGF by MOHITUL and others.

5.    In or about late 2005, lenders started to become suspicious of NGF and its practices.  For example, at that time Fremont Investment and Loan ("Fremont") and Long Beach Mortgage Company ("Long Beach") stopped doing business with NGF because of the high foreclosure rate on its mortgages.  The lenders also found a pattern of fraudulent employment and income information when they audited the corresponding mortgage applications.  Fremont and Long Beach shared this information with law enforcement, resulting in the initiation of this investigation.

6.    As set forth in detail below, according to information provided by CW1 and corroborated by documentary evidence and information provided by other witnesses, the defendants charged in this complaint engaged in an extensive conspiracy ("the conspiracy") to commit mortgage fraud.  The goal

of the mortgage fraud conspiracy described herein is to obtain real estate, money and merchandise on credit, with no intent to repay. The members of the conspiracy buy and sell real estate properties repeatedly among themselves. As a property is sold and resold, the members of the conspiracy cause the appraisal value to rise until it can no longer be justified; at that point the conspirators allow the property to enter foreclosure. With varying levels of knowledge and culpability, mortgage brokers, real estate agents, title companies, attorneys and banks all facilitate the real estate transactions.

7. According to CW1, the conspiracy begins with the establishment of false identities. I am informed by CW1 that identities are either purchased from Bangladeshi immigrants leaving the United States and returning to Bangladesh or are fictitious identities created and attached to legitimate Social Security numbers. Once an identity is obtained, the credit score is built up by applying for several credit cards and then keeping the accounts current. When the credit score reaches a level banks find acceptable for lending, the managers of the conspiracy provide the straw buyers with false identification documents, such as driver's licenses and resident alien cards.

8. According to CW1, the managers pay the straw buyers to participate in real estate closings using these false identities. Once a reliable straw buyer is associated with a

credit-worthy identity, the manager arranges for the straw buyer
to obtain multiple mortgages and purchase multiple properties
within a brief period of time.  Since the conspiracy uses
different banks, and in my experience, transactions usually do
not appear on a credit report for one to two months after the
transaction, lenders do not have the opportunity to discover that
other mortgages had been assumed by the buyer almost
simultaneously.

9.    According to CW1, many of the documents exchanged
during the closing process are false.  The straw buyers fill out
their mortgage applications with fraudulent information about
their employment and income.  The houses are usually appraised
above or at the top end of their values.  I have recovered
documents demonstrating that appraisers have appraised one-family
homes as two-family homes to inflate the value.  Straw buyers
falsely indicate that they will live at the purchased properties,
since mortgage lenders offer a lower interest rate if the
property is a primary residence rather than an investment
property, and are often willing to finance one hundred percent of
the purchase price for a primary residence.  The managers arrange
the one hundred percent financing transactions to include no down
payment.  The sellers in these transactions are either the
conspirators themselves, or sympathetic members of the
Bangladeshi community.  My analysis reveals that properties

involved in the conspiracy are typically sold once a year and accompanied by an appreciation in value of approximately $100,000 per sale.

10.   My investigation has revealed that approximately 15 mortgages were arranged at the Jackson Heights branch of NGF and nearly every one went into foreclosure.  Because of the alarming foreclosure rate, the Jackson Heights branch of NGF ceased operations in January 2006.  Four of the fraudulent loans that were still being processed by the Jackson Heights branch were transferred to Exoro Funding (Exoro), which also held itself out as a mortgage broker.  Exoro was established by a former NGF employee.  Since Exoro was a new entity, it was able to conduct business with Fremont and Long Beach, two of the banks that were repeatedly victimized by NGF.  These four remaining loans were processed and secured through Exoro Funding.

11.   According to CW1, as set forth in more detail below, TOGOR, MOHITUL and ZUBAIR recruit straw buyers who knowingly employ false identities and sign documents at the banks and at closings for the conspiracy.  The names of TOGOR, MOHITUL and ZUBAIR do not appear on any of the loan applications, mortgage documents, bank statements, credit card bills, or any other documentation associated with this fraud.

12.  According to CW1, as set forth in more detail below,  AHMED, JEWEL, HASAN, IQBAL, KABIR, SADI and RAHMAN

constitute known straw buyers associated with this conspiracy.
These straw buyers often have credit problems and approach a
member of the aforementioned leadership group for financial help.
The members of the leadership group provide the straw buyers with
photo identification, usually with the straw buyer's photograph
alongside a false name, and instructions on where to go and what
to do.  Through my investigation, I have linked straw buyers such
as AHMED, JEWEL and HASAN to multiple false identities.  SADI can
be linked to at least five false identities.  In exchange for
attending the closings and signing documents under false names,
these straw buyers receive approximately $5,000 per transaction.

13.  American Home Mortgage ("American Home"), Argent
Mortgage ("Argent"), Long Beach, Fremont, New Century Mortgage
("New Century"), Aurora Loan Services ("Aurora"), BNC Mortgage
("BNC"), Lehman Brothers Bank ("Lehman Brothers"), Equifirst
Corporation ("Equifirst"), Webster Bank and HSBC are financial
institutions, the deposits of which are insured by the Federal
Deposit Insurance Corporation.  Information provided by the
mortgage lenders in connection with the loans described herein
reveals that mortgage payments are either not made by the buyers
and the properties go into foreclosure shortly thereafter or
payments are made with checks that are fraudulent or must be
returned due to insufficient funds.

14.    In addition to CW1, three other cooperating witnesses ("CW2,""CW3" and "CW4"), who have extensive knowledge of the Bangladeshi community and information regarding the conspiracy which has proven reliable, were interviewed regarding their involvement and/or knowledge of the fraud scheme described above.  The information provided by these witnesses has corroborated the information provided by CW1 and confirmed the existence of the conspiracy described herein.  CW1, CW2[2], CW3[3], and CW4[4] provided information regarding the following specific transactions:

II.   THE TRANSACTIONS

### THE LALON AHMED CLOSINGS

15.    In or about August 2006, CW1 advised me that a closing was held at NGF during 2005 for a property purchased in the name "Abdul Rouf" and that two closings were held at Exoro in 2006 for properties purchased in the name "Abdul Barek."  CW1

---

[2]    CW2 pled guilty to fraud charges in a related investigation concerning credit card bust-outs and agreed to cooperate with law enforcement in the hope of receiving a lesser sentence.  CW2 is especially familiar with the leaders of the conspiracy.  His/her information has proven reliable.

[3]    CW3 pled guilty to fraud charges in a related investigation, and is currently in custody.  He/she agreed to cooperate with law enforcement in the hope of receiving a lesser sentence, with information that had proven reliable.

[4]    CW4 operates at the fringes of this conspiracy and has extensive knowledge of the subjects of this case.  His/her information has proven to be reliable.

informed me that LALON AHMED was recruited as the straw buyer for those closings, using false documentation for the identities "Abdul Rouf" and "Abdul Barek."  CW1 provided me with the addresses for the three properties: 104-16 164th St, Jamaica, New York 11433; 108-37 171st Place, Queens, New York and 89-23 127th Street, Richmond Hill, New York 11418.  According to CW1, ZUBAIR brought AHMED to MOHITUL at NGF and a broker at Exoro Funding, who then directed the preparation of the fraudulent mortgage application and the process by which mortgages were obtained for these properties.  CW1 further stated that ZUBAIR, AHMED and MOHITUL knowingly prepared false identity and credit information and submitted that information to financial institutions in order to fraudulently obtain mortgage loans.

16.   I performed database checks using ACRIS and Autotrack.  These checks corroborated the information provided by CW1 by revealing that the three aforementioned properties were purchased by "Abdul Barek" and "Abdul Rouf."

17.   The following information was obtained from New York City's property register database:  On or about March 9, 2006, "Abdul Barek" obtained substantial loans from BNC, located in Irvine, California, and Lehman Brothers, located in New York, New York, to purchase the property located at 104-16 164th Street, Jamaica, New York.  On or about March 22, 2006, "Abdul Barek" obtained two substantial loans from Fremont to purchase

the property located at 108-37 171st Place, Queens, New York. On or about November 21, 2005, "Abdul Rouf" obtained two loans from Long Beach to purchase the property located at 89-23 127th Street, Richmond Hill, New York (the "127th Street property").

18. I then subpoenaed files from BNC, Lehman Brothers, Fremont and Long Beach relating to the mortgages to "Abdul Barek" and "Abdul Rouf," as well as files from the title company, that included photocopies of the identification presented by the buyer at the three closings. The identification documents consisted of a photocopy of a Bangladeshi passport in the name of "Abdul Barek" and a Pennsylvania driver's license in the name of "Abdul Rouf", which is clearly fraudulent, as the identification contains the wrong number of digits. The photographs on the identification documents are of the same individual.

19. CW1, CW2 and CW4 were separately shown copies of the passport and fake driver's license in the names "Abdul Barek" and "Abdul Rouf", and they identified the person in the photographs as "Lalon." CW4, CW1 and CW2 then separately looked at a photograph of LALON AHMED obtained from the New York State Department of Motor Vehicle and identified that photograph as the same "Lalon."

20. A review of the BNC, Lehman Brothers and Fremont files for the properties purchased by "Abdul Barek" reveals that Barek listed his employer as GF Caterers, 89-28 127th Street,

Richmond Hills, New York, 11418.  I have been informed by CW1 that GF Caterers is a fictitious business set up by ZUBAIR.  CW1 stated that calls to the phone number that appeared in bank documents for GF Caterers were forwarded to ZUBAIR's telephone, and ZUBAIR, posing as a representative of GF Caterers, verified Barek's employment there.

21.  A review of the Long Beach files for the property purchased by "Abdul Rouf" reveals that Rouf listed his employer as US Aarong, Inc., 37-18 73rd Street, Jackson Heights, New York.  CW1 advised me that ZUBAIR paid the owner of US Aarong to falsely tell bank officials that Rouf worked at that company.

22.  According to officials at BNC, Lehman Brothers, Fremont and Long Beach, the banks each relied upon the false identification and credit-related information in issuing six loans totaling over $1,690,000.

<u>THE IQBAL HASAN CLOSINGS</u>

23.  In or about August 2006, CW1 advised me that the false name "Mohammed Sajjad Hossain" was used to purchase five properties by the straw buyer IQBAL HASAN ("IQBAL").  CW1 provided me with a date of birth and social security number associated with the "Mohammed Sajjad Hossain" identity.  CW1 and CW4 informed me that TOGOR had recruited IQBAL to assume the "Hossain" identity and use "Hossain's" identification to purchase these properties.  According to CW1, TOGOR and IQBAL knowingly

prepared false identity and credit-related information and submitted that information to financial institutions in order to fraudulently obtain mortgage loans.  CW1 advised that TOGOR brought IQBAL to a series of closings arranged by mortgage brokers based in Long Island.

24.  I performed database checks using ACRIS and Autotrack.  These checks corroborated the information provided by CW1 by revealing that several properties were purchased by "Mohammed Sajjad Hossain," including two properties in Queens, New York.

25.  The following information was obtained from New York City's property register database: on or about June 12, 2006, "Mohammed Sajjad Hossain" obtained two substantial loans from Fremont to purchase the property located at 107-21 Watson Place Jamaica, New York.   On or about June 30, 2006, "Mohammed Sajjad Hossain" obtained two more substantial loans from Fremont to purchase the property located at 164-07 107th Avenue, Jamaica, New York.

26.  I then subpoenaed files from Fremont relating to the mortgages provided to "Mohammed Sajjad Hossain," as well as files from the title company, which included photocopies of the identification documents presented by the straw buyer at the two closings.  The documents included a New York driver's license in the name of "Mohammed Sajjad Hossain."

27. CW1 and CW4 were shown a photocopy of the "Hossain" New York driver's license. They both recognized the person on the driver's license as "Mohammed Sajjad Hossain" but they believed that "Hossain" was not in the United States at the times of these closings. Moreover, TOGOR and IQBAL told CW1 that IQBAL used the "Mohammed Sajjad Hossain" identity and signed documents in that name during the closings for five properties. CW1 and CW4 informed me that IQBAL was able to use the "Hossain" driver's license to purchase the aforementioned properties because Iqbal resembles Hossain.

28. According to Fremont representatives, Fremont relied upon the false identity and credit information in issuing the mortgage loans to "Hossain," totaling over $1,080,000.

## THE MOHAMMED JEWEL CLOSINGS

29. In or about August 2006, CW1 advised me that a closing was held at NGF on or about March 22, 2006 for a property purchased in the name "Wahid Chowdhury" by the straw buyer MOHAMMED JEWEL. CW1 provided me with the address for the property: 150-28 Shore Avenue, Jamaica, New York 11433. According to CW1, ZUBAIR had recruited JEWEL to assume the identity of "Wahid Chowdhury" and use false identification to purchase this property. CW1 informed me that ZUBAIR brought JEWEL to MOHITUL, who then directed the preparation of the mortgage application and the process to obtain the mortgage. CW1

further stated that ZUBAIR, MOHITUL and JEWEL knowingly prepared false identity and credit-related information and submitted that information to financial institutions in order to fraudulently obtain mortgage loans.

30. Database checks, using ACRIS and Autotrack corroborated the information provided by CW1 by revealing that the aforementioned property was indeed purchased in the name of "Wahid Chowdhury."

31. The following information was obtained from New York City's property register database: on or about March 3, 2006, "Wahid Chowdhury" obtained two substantial loans from Aurora to purchase the property located at 150 Shore Avenue, Jamaica, New York.

32. I subpoenaed files from the financial institutions that provided the mortgages to "Wahid Chowdhury," as well as files from the title company, which contained photocopies of the identification documents presented by the buyer at the closing, including a Bangladeshi passport in the name "Wahid Chowdhury."

33. CW1, CW2 and CW4 were separately shown the photocopied passport photograph of "Wahid Chowdhury," and each identified the person in the photo as JEWEL.

34. According to the mortgage application, "Wahid Chowdury" worked for two years for Akobash Books and Video, located at 37-18 73rd Street, Jackson Heights, New York with a

phone number of 718-205-2002.  "Wahid Chowdury" allegedly earned $10,500 per month as a manager.  CW1 informed me that no one by the name of "Wahid Chowdury" worked for Akobash Books and Video and that ZUBAIR paid the owner of this business approximately $500 each time the bank called to verify employment.  According to CW1, employees at NGF plugged in the income amount that would meet the bank's required minimum income to purchase a property of that value.

35.  According to Aurora representatives, Aurora relied upon the false identity and credit information in issuing the mortgage loans to "Hossain," totaling over $1,080,000.

### THE MEHDI HASAN LOANS

36.  In or about August 2006, CW1 informed me that a closing was held at Exoro during 2006 for a property purchased in the false name "MD Karim," located at 150-40 84th Avenue, Jamaica, New York 11435.  CW1 also informed me that ZUBAIR had recruited MEHDI HASAN to assume the identity of "MD Karim" and use false identification to purchase this property.  According to CW1, ZUBAIR brought HASAN to a broker at Exoro, who then directed the preparation of the mortgage application and the process to obtain the mortgage.  CW1 further stated that ZUBAIR and HASAN knowingly prepared false identity and credit-related information and submitted that information to financial institutions in order to fraudulently obtain mortgage loans.

37.   Database checks, using ACRIS and Autotrack, corroborated the information provided by CW1 by revealing that the aforementioned property was indeed purchased in the name of "MD Karim."

38.   The following information was obtained from New York City's property register database: on or about April 19, 2006, "MD Karim" obtained two substantial loans from Long Beach to settle the purchase of the property located at 150-40 84th Avenue in Jamaica.

39.   I then subpoenaed files from Long Beach relating to the mortgages provided to "MD Karim," as well as files from the title company, which included photocopies of the identification presented by the person posing as "MD Karim" at the closing.   The documents included a Bangladeshi passport in the name "MD Karim" that the buyer used at the April 19, 2006 closing.

40.   CW1 was shown that passport and identified the person in the photograph as HASAN.   At a later date, in February 2007, ZUBAIR admitted to CW1 that HASAN was the person who posed as "MD Karim."

41.   According to Long Beach representatives, Long Beach relied upon the false identity and credit-related information in issuing the mortgage loans to "MD Karim," which totaled over $744,000.

42.   In or about January 2007, ZUBAIR approached CW1 and solicited advice regarding ZUBAIR's attempts to purchase approximately twelve additional properties using the identities "Mafizur Rahman" and "Mohammed Alam." During the course of these discussions, ZUBAIR informed CW1 that HASAN had agreed to pose as "Mafizur Rahman" at the closings. CW1 provided me with a series of e-mails that document ZUBAIR's communications with mortgage brokers as part of this effort.

43.   CW1 recorded a meeting with ZUBAIR in February 2007, during which, in sum and substance, ZUBAIR discussed his plans for buying these properties with the false identities. ZUBAIR showed CW1 the resident alien cards prepared for the closings, and CW1 turned over copies to me. CW1 stated that the person in the photograph on the fraudulent "Mafizur Rahman" resident alien card was the same person in the photograph from the Bangladeshi passport for "MD Karim," that is, MEHDI HASAN.

### THE HUMAYUN KABIR LOANS

44.   In or about October 2006, CW1 advised me of a recent conversation he had engaged in with TOGOR. During this conversation, TOGOR advised CW1 that TOGOR had arranged to pay HUMAYUN KABIR approximately $100,000 for the use of his identity to buy properties. TOGOR showed CW1 a photocopy of the New York State driver's license and social security card that he would use to carry out the scheme. CW1 provided a copy of these identity

documents to me.  I have verified through the New York DMV that the driver's license is valid.

45.  CW1 invited KABIR to a meeting, which took place on or about April 6, 2007.  During the meeting, which CW1 recorded at my request, CW1 and KABIR discussed KABIR's fraudulent activities with TOGOR.  During that meeting, KABIR described how TOGOR directed him to purchase the following properties in New York City: 170-03 88th Avenue, Jamaica, New York and 194-31 112th Road, Jamaica, New York.  KABIR stated that TOGOR made all of the arrangements for the purchases, including selecting the properties, and directed Kabir to be present for the closings.  In addition, KABIR stated, in substance, that TOGOR had promised to pay him $100,000 for the use of his identity but had given KABIR only $49,000.  KABIR also described how a third property, located at 3441 Berkley Avenue, Drexel Hill, Pennsylvania 19026 was purchased by TOGOR's brother, Mohammed Ali Polash, using KABIR's identity, without KABIR's participation.

46.  Database checks, using ACRIS and Autotrack, corroborated the information provided by CW1 by revealing that the two aforementioned New York City properties were purchased in the name of "Humayun Kabir."

47.  The following information was obtained from New York City's property register database: on or about October 17,

2006, "Humayun Kabir" obtained two substantial loans from Equifirst Corporation, located at 500 Forest Point Circle, Charlotte, North Carolina, to settle the purchase of the property located at 170-03 88th Avenue, Jamaica, New York 11432.

48.   On or about November 30, 2006, "Humayun Kabir" obtained two substantial loans from American Home, located at 520 Broadhollow Road, Melville, New York 11747, to settle the purchase of the property located at 194-31 112th Road, Jamaica, New York 11412.

49.   In sum and substance, KABIR admitted to CW1 that no mortgage payments had been made and that TOGOR was currently living rent-free at the 194-31 112th Road, Jamaica property.

THE GOLAM BAHUDDIN SADI CLOSINGS AND RELATED FRAUD ACTIVITY

50.   In or about March 2007, CW3 advised me that GOLAM BAHUDDIN SADI was paid $5000 to pose as "Debu Roy" at a closing. In connection with that closing, CW3 received $3,000 from CW4 for introducing him to SADI and for producing a New York State driver's license for "Debu Roy."   SADI's photograph was on the license.

51.   CW3 also admitted that TOGOR sold CW3 a collection of 12 or 13 credit cards in the name "Golam Kader" for $5000, to be used in furtherance of a fraud they would jointly orchestrate, along with SADI.   CW3 created a resident alien card in the name "Golam Kader" with a photograph of SADI, to be used as

identification purposes while using the credit cards. CW3 was arrested in Philadelphia for the fraudulent use of these credit cards, and law enforcement agents found the fraudulent "Golam Kader" resident alien card containing SADI's photograph in CW3's possession.

52. In or about March 2007, at my direction, CW1 invited SADI to a meeting to discuss SADI's involvement in the aforementioned fraud. The meeting was held in an office that contained hidden video and audio recording equipment installed by the FBI. During the meeting, SADI told CW1 that he purchased a number of properties using fraudulent identities, including the name "Shah Iskander Kahn." CW1 provided me with notes that were taken at the meeting by a third party, and those notes included the name "Shah Iskander Khan" as the purchaser of 127-01 89th Avenue, Richmond Hill, New York and 168-47 93rd Avenue, Jamaica, New York. New York City's property registration website, ACRIS, indicates that the name "Shah Iskander Kahn" was indeed used to purchase the properties identified by SADI during his recorded meeting with CW1. On or about September 26, 2006, "Shah Iskander Khan" obtained a substantial loan from GFI Mortgage Bankers Incorporated to purchase the property located at 127-01 89th Avenue, Richmond Hill, New York. On or about October 15, 2006, "Shah Iskander K ahn" obtained a substantial loan from Alliance

Mortgage Banking Corporation for the property located at 168-47
93rd Avenue, Jamaica, New York.

53.  In or about April 2007, at my direction, CW1
invited SADI to another meeting which was recorded by FBI audio
and video equipment.  During this meeting, SADI admitted that he
did not want to provide CW1 with the "Debu Roy" identity for
additional fraudulent activity, because he was concerned that
there was an ongoing investigation by an unknown law enforcement
agency.  SADI admitted using an identification document with his
photograph and the name "Debu Roy" to buy a property.  SADI also
admitted that he had engaged in identity and credit card fraud
with CW3, and would have been arrested in Pennsylvania with CW3,
if he had not overslept.

<u>ZUBAIR TITLE TRANSFERS</u>

54.  In or about March 2007, I instructed CW1 to invite
ZUBAIR to a meeting to transfer title to properties controlled by
him to CW1.  At my direction, CW1 explained to ZUBAIR that, after
he transferred the titles to CW1, CW1 would attempt to negotiate
a "short pay" with the bank that held the mortgages.  CW1
explained the short pay to ZUBAIR by saying that CW1, as the
legal owner of the properties, could negotiate a deal with the
bank to write off the second mortgage and clear the first
mortgage at a steep discount.  After re-taking control of the
property for a fraction of what was owed, ZUBAIR and CW1 could

then sell the property to another straw buyer at market value.
ZUBAIR readily agreed.  CW1 further explained to ZUBAIR that he
needed to bring the identification used for the purchase of the
property to make the deal appear official to the bank.  An FBI
undercover employee would attend the meeting posing as the title
closer and notary public.

55.  In or about March 2007, CW1 hosted the title
transfer meeting at an office that contained video and audio
recording equipment installed by the FBI.  The meeting was
attended by ZUBAIR, an unknown male, CW1, and an FBI undercover
agent.  During the meeting, which was recorded on video and
audiotape, ZUBAIR instructed the unknown male to sign three
different names, transferring the title of five different
properties to CW1.  The owners' names and associated property
addresses included: "Abdul Barek," the owner of 104-16 116th
Street, Queens, New York; "Mostofa Uddin," the owner of 104-59
219th Street, Queens, New York; and "Tarique Sheikh," the owner
of the other three properties.  The only identification presented
by ZUBAIR was a New York driver's license in the name of "Tarique
Sheikh."  No identification was presented for "Abdul Barek" or
"Mostofa Uddin."  CW1 advised me after the simulated title
transfer meeting that ZUBAIR asked him to pay the unknown male
"straw buyer" $4,000 for each property that was transferred.

MOHITUL TITLE TRANSFERS

56.   I instructed CW1 to invite MOHITUL to a similar meeting, allegedly to transfer title to properties controlled by him to CW1.  At my direction, CW1 explained the "short pay" concept to MOHITUL and explained the need for the identification documents that had been used to purchase the property.  As with the ZUBAIR transfer meeting, the transfers would not be official, and an FBI undercover employee would attend the meeting posing as the title closer and notary public.

57.   In or about March 2007, CW1 hosted a title transfer meeting that was capture on video and audiotape.  The meeting was attended by MOHITUL, an unknown male, CW1, and an FBI undercover employee.  During the meeting MOHITUL instructed the unknown male to sign six different names, transferring the title of seven different properties to CW1.  The owner's names and associated property addresses included: "Humayun Kabir," as the owner of 170-03 88th Avenue, Jamaica, New York; "Hossain Ali," as the owner of 34-50 70th Street, Jackson Heights, New York; and "Badal Mia," as the owner of 24-29 92nd Street, East Elmhurst, New York.  MOHITUL presented photocopied identification documents for five of the six sellers.  As with the ZUBAIR meeting, all of the documents associated with this simulated title transfer were turned over to me following the simulated transfer.  CW1 advised me after the simulated title transfer meeting that the picture on

the "Hossain Ali" identity document was actually a picture of MIZANUR RAHMAN.

58.   I checked the ACRIS database and discovered that the 34-50 70th Street property that had been "transferred" in the false title transfer meeting had been purchased by "Hossain Ali" on March 7, 2006. "Hossain Ali" had obtained two substantial loans from WMC Mortgage Corporation, located at 1 Ramland Road in Orangeburg, New York to settle the purchase of the property located at 34-50 70th Street, Jackson Heights, New York.

59.   In or about April 2007, CW1 engaged in a meeting with RAHMAN that was captured on video and audiotape. During this meeting, RAHMAN admitted to using the "Hossain Ali" identity to buy two properties at the direction of MOHITUL.   I have a permanent legal resident alien card in the name "Hossain Ali" with RAHMAN's photograph attached.   I checked with the Bureau of Immigration and Customs Enforcement and they confirmed that this was a fraudulent card.

WHEREFORE, I respectfully request that arrest warrants be issued so that the defendants MOHAMMED ZUBAIR HOSSAIN, TOGOR LNU, MOHITUL ISLAM, LALON AHMED, MOHAMMED JEWEL, MEHDI HASAN, IQBAL HASAN, HUMAYUN KABIR, GOLAM BAHAUDDIN SADI, and MIZANUR RAHMAN be dealt with according to law.

Joseph Moriarty
Special Agent
Federal Bureau of Investigation

Sworn to
day of Ap

UNITED S'                    GE
EASTERN L